IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MONTANA
HELENA DIVISION

| | |
|---|---|
| MARK TEMPLIN,<br><br>        Plaintiff,<br><br>   vs.<br><br>THE UNITED STATES OF<br>AMERICA,<br><br>        Defendant. | CV 11–59–H–DWM<br><br><br>FINDINGS OF FACT AND<br>CONCLUSIONS OF LAW |

**FILED**

MAY 0 6 2013

Clerk, U.S. District Court
District Of Montana
Missoula

Plaintiff brings this medical negligence case against Defendant under the

Federal Tort Claims Act, 28 U.S.C § 2671, *et seq*. He alleges Dr. Patrick Morrow,

a physician employed by Defendant at Fort Harrison VA Medical Center,

negligently misdiagnosed him and then told him he had metastatic brain cancer, a

mistake that he claims caused significant emotional distress.

Plaintiff's independent negligent infliction of emotional distress claims

were dismissed, as they are not compensable under Montana law. Claims against

Dr. Randy Sibbitt and his employer, Montana Interventional and Diagnostic

Radiology Specialists, PLLC, were dismissed on stipulation of the parties. Mark

Templin's medical negligence claim against the United States remains. Jurisdiction is proper pursuant to 28 U.S.C § 1346(b). A bench trial was held April 15 and 16, 2013 at the Paul G. Hatfield United States Courthouse in Helena, Montana. After considering the evidence and testimony submitted at trial, along with the parties' arguments and proposed findings of fact and conclusions of law, I find in favor of the Plaintiff. The decision is based on the following Findings of Fact and Conclusions of Law.

## I. Findings of Fact

**A.  Mr. Templin was diagnosed with terminal metastatic brain cancer at Fort Harrison VA Medical Center.**

1.  Fort Harrison VA Medical Center is a unit of the VA Montana Health Care System, chartered under the Veterans Health Administration, a component of the United States Department of Veterans Affairs.

2.  On January 28, 2009, Mr. Templin arrived at the Fort Harrison VA Medical Center Emergency Department complaining of acute chest pain. He underwent cardiac catheterization with stent placement. Mr. Templin had good clinical outcome from the catheterization and stent placement.

3.  In the days following, until his discharge on February 4, 2009, Mr. Templin developed word recall difficulty, memory deficiencies, speech deficiencies,

an unsteady gait, and headaches.

4.  On February 4, 2009, Mr. Templin had acute onset of right lateral visual field loss.

5.  Mr. Templin's attending physician, Dr. Patrick Morrow, an internist, requested an ophthalmology consultation.

6.  At all times relevant to the allegations of the complaint, Dr. Morrow acted within the scope of his employment as a physician treating Mr. Templin as a patient at Fort Harrison VA Medical Center.

7.  Mr. Templin was referred to an ophthalmologist, Dr. Paul Berner, who performed the exam.

8.  Dr. Paul Berner found homonymous hemianopsia (visual field deficit signifying brain involvement) consistent with stroke activity. He recommended a x-ray computed tomography (CT scan) to identify sources of the possible embolus.

9.  Dr. Paul Berner's testimony is credible.

10. Dr. Morrow acknowledges Mr. Templin's symptoms, including trouble with balance, finding words, and vision, were consistent with a stroke, that stroke was a working diagnosis after the ophthalmologist consult, and the determination of homonymous hemianopsia further signified a

-3-

cerebrovascular accident (CVA/stroke).

11. A CT scan, without contrast, was ordered and administered.

12. Dr. Morrow acknowledges that a non-contrast CT scan is preliminary and not a definitive study.

13. A non-contrast CT is an adequate study to show Mr. Templin's brain abnormalities, but it is an inadequate basis to differentiate the cause of the abnormalities.

14. Dr. Randy Sibbitt, a neuroradiologist, interpreted the CT scan.

15. Dr. Sibbitt's reported impression of the CT scan was: "Probable metastatic tumor to brain. The only other considerations would be cerebritis with abscesses."

16. Dr. Sibbitt showed Dr. Morrow the CT images and they discussed the scan. Dr. Sibbitt discussed with Dr. Morrow a variety of differential diagnoses, including stroke activity.

17. Dr. Morrow left the meeting with Dr. Sibbitt with the clear understanding that the abnormalities observed on the non-contrast CT scan could have been from one of many possible etiologies, including stroke activity. Dr. Sibbitt's interpretation of the non-contrast CT was communicated to Dr. Morrow as his impressions and not a definitive diagnosis.

-4-

18.     Dr. Sibbitt discussed with Dr. Morrow the possibility of further diagnostic testing to narrow the possible etiologies of the abnormalities present on Mr. Templin's initial non-contrast CT.

19.     Dr. Sibbitt's testimony is credible. While the Court finds it highly likely he and Dr. Morrow discussed multiple differential diagnoses, it does not foreclose the possibility that Dr. Sibbitt's interpretation of the scan and limited formal documentation of his impressions encouraged Dr. Morrow to prematurely reach a definitive diagnosis of metastatic brain cancer.

20.     The Fort Harrison VA Medical Center Tumor Board met February 4, 2009.

21.     The Tumor Board is made up of several physicians, including an oncologist, Dr. Karl Guter.

22.     Dr. Guter's testimony by video deposition is credible.

23.     The Tumor Board meets regularly to discuss cancer cases.

24.     The Tumor Board does not meet to discuss stroke or brain infection cases.

25.     Dr. Morrow presented Mr. Templin's case to Dr. Guter and the Tumor Board.

26.     Dr. Guter believed Dr. Morrow's presentation to the Tumor Board was based on a definitive study. Dr. Morrow presented the case as a strong suspicion of metastases to the brain.

-5-

27.   Dr. Guter was under the impression that the scan presented by Dr. Morrow at the Tumor Board was a contrast-enhanced CT scan. Accordingly, he did not suggest at the meeting of the Tumor Board that a Magnetic Resonance Imaging (MRI) of the brain be administered to Mr. Templin.

28.   On later reflection, when dictating notes from the Tumor Board meeting, Dr. Guter noted an MRI would be helpful to solidify Mr. Templin's diagnosis.

29.   Dr. Morrow did not present the differential diagnosis of stroke at the Tumor Board meeting.

30.   After the Tumor Board meeting, Dr. Morrow's working diagnosis for Mr. Templin's affliction was metastatic neoplasm.

31.   The discharge summary as prepared by Dr. Morrow discusses metastatic cancer to the brain as a working diagnosis; it states "following my discovery of the metastatic brain tumors . . . I then reviewed my findings with Mr. Templin, his wife, and his daughter."

32.   Dr. Morrow acknowledges he does not have a specific memories of the conversations he had February 4 and 6, 2009 with Mr. Templin, Marion Templin (his wife), Donna Patterson (his daughter), and Karen Chilcoat (his daughter).

33.   Dr. Morrow testified that he told Mr. Templin that his "greatest fear" was

metastatic tumors of the brain and that further diagnostics were needed.

34.    Dr. Morrow testified that he advised Mr. Templin to undergo an MRI of the
brain.

35.    There is no indication in Mr. Templin's medical records that Dr. Morrow
suggested an MRI or further diagnostic workup.

36.    Dr. Morrow confirms that medical records are intended to memorialize and
document care and treatment, including communications with a patient.

37.    Dr. Morrow's testimony is precise and, in most cases, credible. Dr. Morrow
recognizes the limitations of memory and the necessity of relying on records
documenting his interactions with Mr. Templin and his family in February
2009. His statements about the diagnosis communicated to Mr. Templin are
credible to the extent he recognizes the diagnosis he intended to
communicate and the diagnosis understood by Mr. Templin were likely not
congruent.

38.    Given the non-specific nature of Dr. Morrow's memories of
communications with the Templin family, the Court finds his entries in
medical records more reliable than his testimony concerning those events.

39.    Mr. Templin and his family understood Dr. Morrow's communication of the
results of the non-contrast CT scan as a diagnosis of brain cancer.

40.     Mrs. Templin and Ms. Patterson recall Dr. Morrow stating that Mr. Templin

        had terminal brain cancer and further testing was recommended to

        determine where the cancer came from, but that such tests could not give

        Mr. Templin more time.

41.     Mr. Templin's testimony regarding the communication by Dr. Morrow and

        his impressions after the encounter is credible. His account of other facts

        surrounding the case is also credible.

42.     Mrs. Templin's testimony regarding the meeting with Dr. Morrow and the

        impressions she took away from the meeting regarding her husband's

        prognosis is credible.

43.     Dr. Morrow showed the abnormalities on the non-contrast CT scan to Ms.

        Patterson on her request. Dr. Morrow pointed out an abnormality on the

        scan near the base of Mr. Templin's neck which Dr. Morrow claimed was

        causing vision and walking difficulties. Ms. Patterson asked Dr. Morrow

        how her father would die. Dr. Morrow explained one of the tumors would

        grow "like cauliflower" and Mr. Templin would die from a brain bleed.

44.     Dr. Morrow testified that Mr. Templin went home with the understanding he

        had a grim prognosis after a discussion with Dr. Morrow that proceeded

        "from the point of view of cancer treatment."

-8-

45.    At the initial conversation where Dr. Morrow presented his diagnosis, Mr. Templin advised Dr. Morrow he did not want to pursue cancer treatment involving chemotherapy, biopsy, or surgery.

46.    Dr. Morrow's addendum progress notes state he discussed "the [workup] and treatment options. We talked about what would happen without treatment and his prognostic timeline in either case." Dr. Morrow wrote Mr. Templin "understands that his prognosis is grim and that any treatment would be palliative and not curative." He also noted Mr. Templin did not want to sacrifice "quality of life for any potential increase in quantity."

47.    Regarding the conversation with Mr. Templin and his family, the discharge summary prepared by Dr. Morrow states "[e]arly in the discussion, Mr. Templin let all of us know that he was unwilling to undergo any further testing. He was not interested in pursuing any kind of treatment and therefore felt that further testing would be unreasonable and likely cause him discomfort that he didn't want to have to deal with . . . he had decided that there was no way that he would undergo chemotherapy or radiation."

48.    Mr. Templin declined further work-up because he did not want to pursue cancer treatment.

49.    Dr. Morrow was aware Mr. Templin's desire not to pursue further treatment

was motivated by his understanding of the diagnosis as definitively metastatic brain cancer.

50.   Dr. Morrow prescribed Decadron and Dilantin. Both medications are suggested for brain cancer patients. Decadron is contraindicated for stroke patients.

51.   Dr. Morrow ordered hospice care for Mr. Templin.

52.   Hospice care is provided for the terminally ill, specifically those patients with a remaining life expectancy of less than six months.

53.   Mr. Templin had hospice care in the family home after he was released from the hospital.

54.   Mr. Templin's hospice care was paid for in whole by Medicare.

55.   Dr. Monica Berner, who took over Mr. Templin's care after his discharge, certified under federal law that hospice care was required given Mr. Templin's diagnosis with "brain cancer" and his terminal illness "with a life expectancy of six (6) months or less if the terminal illness runs its normal course."

56.   Dr. Monica Berner based this certification on medical records. Dr. Monica Berner signed the Physician Certification/Recertification of Terminal Illness as a Fort Harrison VA Medical Center doctor authorized to care for Mr.

-10-

Templin.

**B.      Mr. Templin did not, in fact, have terminal brain cancer.**

57.     On June 26, 2009, Mr. Templin's hospice services were terminated at his direction.

58.     On July 1, 2009, Mr.Templin underwent additional testing at Fort Harrison VA Medical Center by CT scan.

59.     On July 2, 2009, Dr. Michael Strekall of Fort Harrison VA Medical Center informed Mr. Templin that the CT scan showed multiple old infarcts consistent with stroke activity, not metastatic brain tumor as originally diagnosed.

60.     On hearing this news, Mr. Templin was amenable to further diagnostic testing.

61.     On October 1, 2009, Mr. Templin underwent another CT scan at Fort Harrison VA Medical Center, which again showed multiple old infarcts consistent with stroke activity.

62.     On December 23, 2009, Mr. Templin underwent additional testing by MRI of the brain. The MRI confirmed stroke activity and not metastatic brain cancer.

63.     On January 13, 2010, Dr. Faust Alvarez, Chief of Staff at VA Fort Harrison

Medical Center at the time, sent a letter to Mr. Templin stating "[a]n MRI evaluation of the brain was performed on December 23, 2009 to rule out the possibility of metastatic lesions. It was compared with previous CT examinations completed in February, July and October of 2009. The areas in question, noted on previous CT exams, failed to demonstrate any abnormal enhancement suggestive of tumor process. These areas appear to represent previous stroke activity."

64.   Dr. Alvarez indicates these statements do not amount to an admission of fault or that diagnosis was actually faulty as no investigation of the underlying complaint had taken place.

65.   Dr. Alvarez's testimony regarding investigation and fault is not credible. The letter was intended to communicate and actually did communicate an acceptance of fault by Fort Harrison VA Medical Center for the misdiagnosis of Mark Templin.

66.   On January 28, 2010, Dr. Strekall noted the changed diagnosis in an adverse event disclosure in Mr. Templin's medical record, which stated "[n]o brain cancer existed and the previous diagnosis was discussed to be in error." Dr. Strekall testified that he entered the adverse event disclosure in his capacity and duty as a Fort Harrison VA Medical Center physician.

-12-

67. Dr. Strekall testified with candor and presented a credible account of his disclosure and documentation of the adverse event and follow-up treatment of Mr. Templin.

**C.** **Significant mental anguish and expense followed the erroneous diagnosis of terminal brain cancer assigned to Mr. Templin.**

68. After communication of the diagnosis, Dr. Morrow advised Mr. Templin and his family to get his affairs in order since Mr. Templin did not want to undergo treatment for the purported cancer.

69. Ms. Patterson called her sister Karen Chilcoat and notified her that their father, Mr. Templin, had been diagnosed with terminal brain cancer.

70. Ms. Chilcoat joined her family at the family residence. Ms. Patterson and Mr. and Mrs. Templin were crying. Ms. Chilcoat describes that time as "pretty devastating for my dad to hear—that he had terminal brain cancer and had to go home to get his affairs in order."

71. Ms. Patterson and her sister, Karen Chilcoat, met with Dr. Morrow on February 6, 2009 to discuss Mr. Templin's prognosis. Dr. Morrow spoke in terms of weeks to months.

72. On February 6, 2009, Dr. Morrow filled out and signed the Health Care Provider section of Ms. Chilcoat's Certification of Health Care Provider for

-13-

Family Member's Serious Health Condition pursuant to the Family and

Medical Leave Act. Dr. Morrow specified that Mr. Templin had metastatic

brain tumors for which he would need increasing care, up to total care for

all Mr. Templin's physical needs, until his death. Dr. Morrow wrote that Mr.

Templin's course of illness would probably be less than six months.

73.    At the family residence after Mr. Templin's discharge on February 4, 2009,

Mrs. Templin was sitting on the couch and crying. Mr. Templin just sat in

his recliner and cried.

74.    Mr. Templin lived in a state of depression for months. After a state of initial

deep depression, Mr. Templin's outlook improved as time passed and he

began to cope with the diagnosis.

75.    Early records of his hospice care in February 2009 indicate Mr. Templin

was very depressed and preoccupied with his diagnosis. Records from April

2009 document Mr. Templin living a more active lifestyle with a more

steady mental outlook. By June 2009 Mr. Templin initiated discussions

about terminating hospice services.

76.    Mr. Templin and his family endured significant mental and emotional

distress in preparation for his anticipated death. He testified that he tried not

to let his family know, but he cried many times and even thought of

shooting himself. Mr. Templin described emotional episodes interrupting his normal business while he was under the impression he had metastatic brain cancer.

77. At one point, Ms. Patterson saw Mr. Templin come into the family home with all of his guns, rifles, and ammunition, and put them on the bed. Ms. Patterson called family to retrieve the items because Mr. Templin said he wanted to take his own life to spare the family from going through the pain and distress associated with his diagnosed terminal illness.

78. Mr. Templin often sat in his chair and did not move around much when Ms. Chilcoat visited. She reported he cried often and slept a lot.

79. Ms. Patterson saw that Mr. Templin did not get on with his life for months and that he remained depressed and suicidal through April 2009.

80. Mr. and Mrs. Templin still cry sometimes about the circumstances surrounding his misdiagnosis.

81. While under the impression that he was afflicted with metastatic brain cancer, Mr. Templin wondered each day whether it would be his last. His wife would often greet him in the morning with a question about whether the day would be his last.

82. Mr. Templin signed a do not resuscitate order, which was displayed on the

refrigerator in the family home while he was under hospice care.

83.   Mr. Templin had to advise his extended family of his diagnosis with

metastatic brain cancer and arranged for some of them to visit a final time.

84.   The family held a "last birthday" dinner for Mr. Templin which cost $200.

85.   The weekend after he was discharged from Fort Harrison VA Medical

Center, the family and arranged for Mr. Templin's funeral. They planned the

service and paid $1,020 for it.

86.   Ms. Chilcoat's husband made a wooden box for Mr. Templin's ashes.

87.   After hearing that he had terminal cancer and figuring he would never drive

again as a result, Mr. Templin sold his truck. He also gave away many

things.

88.   Dr. Morrow advised Mr. Templin that he could not drive. Consequently,

Mr. Templin quit working as a driver.

89.   Had the abnormalities present on the February 4, 2009 CT scan been

diagnosed as consistent with stroke rather than metastatic brain cancer, Mr.

Templin's driving would have been similarly restricted.

90.   Mr. Templin continued to worry that the doctors might be wrong again after

his cancer diagnosis was changed to stroke.

91.   Mrs. Templin was permanently injured in a car accident in 2007 and is

-16-

disabled and very dependent on Mr. Templin.

92.     The family worried about Mrs. Templin's welfare in the event of Mr.

Templin's death. The family feared Mrs. Templin would wake up after Mr.

Templin died during the night or would be alone when Mr. Templin died.

The family tried to make sure Mr. and Mrs. Templin were not alone at the

family home.

## II. Conclusions of Law

93.     To the extent the relief requested in a complaint, if granted, would result in

a judgment that would expend itself on the public treasury, the suit

constitutes an action against the United States of America. *Dugan v. Rank*,

372 U.S. 609, 620 (1962) (citing *Land v. Dollar*, 330 U.S. 731 (1947)).

94.     Plaintiff's action here proceeds against the United States because the relief

sought is due to a breach of legal duty by agents of the United States

Department of Veterans' Affairs, compensation for which would expend on

the public treasury.

95.     The Federal Tort Claims Act waives the government's immunity to suit so

long as the government official sued is acting in the scope of their

employment. *See* 28 U.S.C. §§ 2674, 2680, 2679(d)(1).

96.     The scope of employment is determined by relevant state-law doctrine of

-17-

respondeat superior. *Pelletier v. Federal Home Loan Bank of San Francisco*, 968 F.2d 885, 876 (9th Cir. 1992).

97.   Under Montana law, an employee or agent's acts are attributable to their employer under the doctrine of respondeat superior if the employee or agent was acting in the course of their employment, in furtherance of the employer's interest, or for the benefit of his employer. *Maguire v. State*, 835 P.2d 755, 758 (Mont. 1992) (citing *Cornec v. Mike Horse Mining*, 180 P.2d 252, 256 (Mont. 1947)).

98.   It is uncontested that Dr. Morrow was acting within the scope of his employment and for his employer's benefit as a physician for Fort Harrison VA Medical Center during the events giving rise to the complaint.

99.   Accordingly, sovereign immunity for the tort claim alleged in this action is waived under the Federal Tort Claims Act. *See* 28 U.S.C. §§ 2674, 2680, 2679(d)(1).

100.   Whether a duty exists is a question of law. *See First Interstate Bank of Arizona, N.A. v. Murphy, Weir & Butler*, 210 F.3d 983, 987 (9th Cir. 2000).

101.   In a medical malpractice case, a plaintiff must prove by a preponderance of the evidence: (1) the standard of care, (2) that the defendant departed from the standard of care, and (3) the departure proximately caused plaintiff's

-18-

injury. *Estate of Willson v. Addison*, 258 P.3d 410, 414 (Mont. 2011).

102.   Expert testimony is required to establish the standard unless the " . . .

conduct complained of is readily ascertainable" by a layperson. *Id.*

103.   Even though expert testimony is present in this matter, a layperson could

readily ascertain that a doctor abiding by the relevant standard of care

should not jump to diagnostic conclusions and communicate imminent

death to a patient based on incomplete information or leave a patient with a

mistaken belief as to their health unsupported by a firm diagnosis, or a

reasonable differential diagnosis.

104.   Dr. Morrow had a duty to use the skill and learning ordinarily used in like

cases by other doctors in good standing practicing in the same speciality

with the same national board certification. *See Aasheim v. Humberger*, 695

P.2d 824, 826-27 (Mont. 1985).

105.   Physicians have a duty to "exercise ordinary care to assure that when he or

she advises [a patient] about [their] condition . . . the advice comports with

the standard of care for that health care provider's profession." *Webb v.*

*T.D., D.C., R.K.S., M.D., and C.H.A., M.D.*, 951 P.2d 1008, 1014 (Mont.

1997). This requires the physician to make information regarding the results

of an examination available to the patient. *Id.*

106. A patient's informed consent requires the physician to disclose information a reasonable practitioner would make under similar circumstances. *Collins v. Itoh*, 503 P.2d 36, 40 (Mont. 1972).

107. Dr. Morrow acknowledged that consideration of the entire clinical picture is integral to the decisions an attending physician makes about a patient, as the attending physician has the ultimate responsibility for the diagnosis and treatment of a patient.

108. Dr. Morrow testified that it is important to clearly tell a patient, to the best of the doctor's ability, the options that are available. He further testified that it is important to make things understandable for the patient and to provide the necessary information for the patient to make an informed decision.

109. Dr. Morrow testified that it can be important to tell the patient the differential diagnoses.

110. Dr. Morrow testified that the attending physician must sometimes explain to the patient why further testing is warranted, especially in cases where a diagnosis is uncertain and further testing is needed to determine a definitive diagnosis.

111. Dr. Morrow states a patient's informed decision is one of the pillars of good medical care. Dr. Morrow states it is always important to explain the options

and communicate necessary information so the patient can make informed decisions.

112. Plaintiff's expert Dr. Thomas Bulger is a board certified internal medicine physician, as is Dr. Morrow.

113. Dr. Bulger testified that the February 4, 2009 non-contrast CT scan improperly formed the basis of Dr. Morrow's diagnosis.

114. Dr. Bulger testified that a non-contrast CT scan is a preliminary test, insufficient to differentiate the etiology of the abnormalities identified in Mr. Templin's brain.

115. Dr. Bulger opines that Mr. Templin should have been informed of the preliminary nature of the findings from the non-contrast CT scan instead of the firm diagnosis of metastatic brain cancer.

116. Defendant's expert Dr. Gregory Moore is an emergency physician.

117. Defendant's expert opined that Dr. Morrow provided good care to Mr. Templin in that he addressed his cardiac emergency rapidly and to a favorable outcome. He further opined that Dr. Morrow's investigation of Mr. Templin's other symptoms was expedient and met the standard of care.

118. Dr. Moore's opinion regarding Dr. Morrow's communication to Mr. Templin does not support the conclusion Dr. Morrow met the standard of

care. Dr. Moore opines that a physician should tell a patient about the worst-case scenario. He also opines that limitations of diagnostic testing must be presented to a patient and that all pertinent material facts to their medical condition must be disclosed so a patient can make an informed decision. He went on to say it is incumbent on a physician with an unconfirmed diagnostic hypothesis to present the conditional nature of the diagnosis along with the need for further diagnostic workup to the patient.

119.   Dr. Moore interpreted entries in Mr. Templin's medical record to mean he left the hospital with the impression that he had brain cancer and he refused further treatment and workup because of this belief.

120.   Based on the testimony of Dr. Bulger and Dr. Moore, Dr. Morrow had a duty to adequately inform Mr. Templin of the preliminary nature of impressions based on the non-contrast CT scan so that he could adequately make informed decisions.

121.   Failure to meet the applicable standard of care is a breach of duty. *See Estate of Neilsen v. Pardis*, 878 P.2d 234, 235-36 (Mont. 1994).

122.   Defendant breached the duty it owed to Mr. Templin. This conclusion is supported by evidence, specifically:

122a.   Dr. Morrow's communication of the diagnosis of terminal

-22-

metastatic brain cancer to Mr. Templin and his family on the afternoon of February 4, 2009.

122b. Dr. Morrow's failure to communicate the preliminary, nonspecific, non diagnostic nature of the non-contrast CT scan.

122c. Mr. Templin's medical records, including the progress notes and discharge summary prepared by Dr. Morrow, indicating metastatic cancer to the brain with grim prognosis.

122d. Dr. Morrow's order for hospice care for Mr. Templin.

122e. Dr. Monica Berner's certification that hospice care was required for Mr. Templin.

122f. Ms. Chilcoat's Family and Medical Leave Act forms, as completed and certified by Dr. Morrow, indicating Mr. Templin had metastatic brain tumors with less than six months to live.

122g. Dr. Morrow's presentation of the diagnostic imaging produced from the non-contrast CT to Ms. Patterson and his statement that the tumors would continue to grow until Mr. Templin died of a brain bleed.

122h. The creation of an "institutional disclosure of adverse events"

entry in Mr. Templin's medical record by Dr. Strekall

following Mr. Templin's December 2009 MRI. This disclosure

indicates a misdiagnosis was made and presented to Mr.

Templin.

122i.   A letter dispatched by Fort Harrison VA Medical Center Chief

of Staff Dr. Faust Alvarez dated January 13, 2010 which states

a misdiagnosis was made.

123.   Even though Dr. Morrow admitted he should have adequately discussed the

differential diagnoses and examination results, and admitted a non-contrast

CT scan is only preliminary, he only discussed metastatic brain tumors as

his working diagnosis with Mr. Templin and his family. Dr. Morrow admits

that he told Mr. Templin he had a grim prognosis. Dr. Morrow admits that

his discussions of further testing and care were in reference to cancer

treatment. Dr. Morrow admits Mr. Templin refused further diagnosis and

treatment because he did not want cancer treatment.

124.   Dr. Morrow admits Mr. Templin did not have metastatic brain cancer.

125.   Dr. Morrow admits Mr. Templin and his family left the hospital with the

understanding that Mr. Templin had terminal brain cancer.

126.   Plaintiff did not act negligently. His refusal of further diagnostic testing or

-24-

treatment was based on the limited and erroneous information presented to
him by Dr. Morrow.

127.   Defendant's breach of duty caused harm and damages. The following are
the Court's conclusions on each item of relief sought:

127a.   Plaintiff is entitled to compensation for his mental and
emotional distress, pain, grief, and suffering. Plaintiff's mental
and emotional distress is compensable because it was caused
by Defendant's negligent failure to meet the standard of care in
this case. It is difficult to put a price tag on the anguish of a
man wrongly convinced of his impending death. Mr. Templin
lived for 148 days—from February 4, 2009 to July 2,
2009—under the mistaken impression that he was dying of
metastatic brain cancer. The record establishes the earlier
months of this time was particularly traumatic for Mr. Templin.
Damages for this initial period are more significant than for the
later period, where the record shows Mr. Templin was less
preoccupied by the diagnosis as he began to cope. The first
sign of this transition is in Mr. Templin's hospice record dated
April 15, 2009, where the hospice social worker noted "Marc's

-25-

health seems to be fairly stable at this time and he has been

feeling well emotionally and physically. No psychosocial

concerns are reported. . . . Overall mental status is good." Mr.

Templin is due $500 per day for the initial period of

particularly traumatic and severe mental and emotional distress

he endured from February 4, 2009 to April 15, 2009. This

amounts to $35,500.00. Mr. Templin is due $300 per day for

the later period of severe mental and emotional distress he

endured from April 16, 2009 to July 2, 2009. This amounts to

$23,100.00. The total damages for Mr. Templin's severe mental

and emotional distress are $58,600.00.

127b. Plaintiff is not entitled to compensation for the cost of his

hospice care. Mr. Templin's hospice care was paid-for in whole

by Medicare. Mr. Templin incurred no out-of-pocket cost for

his hospice care and was therefore not damaged.

127c. Plaintiff is not entitled to compensation for lost wages. Mr.

Templin was restricted from driving because of his diagnosis of

metastatic brain cancer. Mr. Templin would have been

similarly restricted had he been assigned the correct diagnosis

of stroke. Accordingly, the misdiagnosis of Mr. Templin did not materially affect his ability to perform his work obligations, as he would have been similarly restricted from driving had the diagnosis assigned to him by Defendant been correct.

127d. Plaintiff is entitled to compensation for a family dinner celebrating Mr. Templin's "last" birthday in the amount of $200.00.

127e. Plaintiff is entitled to compensation for a pre-need funeral agreement in the amount of $1,020.00.

## III.   Judgment

128. Pursuant to 28 U.S.C § 2671, *et seq.*, the United States of America is liable for Mark Templin's misdiagnosis of terminal brain cancer. The damages attributable to this breach in duty total $59,820.00. Judgment is therefore entered against the United States of America and in favor of Mark Templin in the amount of $59,820.00.

IT IS HEREBY ORDERED that the Clerk of Court shall enter judgment in favor of Mark Templin and against the United States of America in accordance with these Findings of Fact and Conclusions of Law.

IT IS FURTHER ORDERED that the Clerk of Court shall close this case.

DATED this ___ day of May, 2013.

14:59 pm

Donald W. Molloy, District Judge
United States District Court